Russell Petroleum, Inc., appeals a judgment by the Elmore Circuit Court holding (1) that property on which Russell Petroleum operated a gasoline service station was validly annexed into the municipal limits of the City of Wetumpka ("the City"), pursuant to Act No. 2001-543, Ala. Acts 2001 ("the Act"), and (2) that, as a consequence of that annexation, Russell Petroleum owes the City for unpaid municipal business-license fees, gasoline taxes, sales taxes, and penalties. We affirm that part of the judgment that validated the annexation, but reverse the judgment insofar as it orders Russell Petroleum to remit to the City municipal sales taxes.
 I. Facts and Procedural Background
Since 1999 Russell Petroleum has operated a convenience store and gasoline station on property along U.S. Highway 231 in Elmore County ("the business"). In 2000 the City passed an annexation ordinance that brought the business into the police jurisdiction of the City. The following year the legislature enacted the Act, expanding the municipal limits of the City by annexing several parcels of land, including the land on which the business was operated, that were formerly outside its boundaries ("the annexation").[1]
On the effective date of the annexation, the City had in effect business-licensing, municipal-gasoline-tax, and municipal-sales-tax regulations. Russell Petroleum did not apply for, or secure, a business license after the annexation. On August 6, 2002, the City sued Russell Petroleum to collect (1) unpaid business-license fees related to the operation of the business during the calendar years 2001 and 2002, and (2) gasoline taxes that Russell Petroleum did not remit to the City on retail sales of gasoline by the business.[2]
Russell Petroleum denied that it was required to purchase a business license from the City or to remit any gasoline taxes. Russell Petroleum asserted in its answer to the City's complaint that it owed no obligations to the City because, it argued, the annexation of the property on which the business is located was invalid. Russell Petroleum also filed a counterclaim asking the trial court to declare the Act unconstitutional and invalid. Among other claims, Russell Petroleum alleged in its counterclaim that the Act was invalid because, *Page 430 
it argues, its proponents failed to comply with the requirement in § 11-42-6(b), Ala. Code 1975, that "a map showing what territory is to be legislatively annexed to . . . [the municipality] [be] on file in the office of the judge of probate in the county . . . wherein [the] territory is located." Further, when Russell Petroleum filed its counterclaim, it interpleaded $36,534.68 into court and asked the trial court to direct "a cy pres refund . . . of any taxes or penalties wrongfully, illegally or unconstitutionally collected." According to Russell Petroleum's counterclaim, the interpleaded funds represented "license fees and gasoline taxes for all periods of illegal assessment."
In October 2002 the City moved the trial court to dismiss the counterclaim and order Russell Petroleum to pay the contested business-license fees and gasoline taxes. Stating that there appeared to be disputed facts concerning the City's compliance with the Alabama Constitution or certain statutes in annexing the property into the municipal limits, the trial court denied that motion and set the City's action for a bench trial on September 23, 2003. Before trial, Russell Petroleum filed an amended answer contesting the City's right to collect taxes for the period in which the business was within the police jurisdiction of the City pursuant to municipal ordinance, but outside the municipal limits. When the trial commenced, the City relinquished its claim against Russell Petroleum for unpaid taxes during that period in which Russell Petroleum was operating in the police jurisdiction, and Russell Petroleum agreed not to challenge the ordinance that brought the business within the police jurisdiction. Consequently, the issues considered at trial were limited to (1) the City's claim for unpaid business-license fees and gasoline taxes in the period after the property on which the business is located was annexed into the municipal limits of the City in 2001, and (2) Russell Petroleum's claims challenging the constitutionality and validity of the Act.
At the September bench trial the court heard oral testimony and received evidence concerning the enactment of the Act; the subjects addressed included the notices of intent to introduce the Act that were published in the Wetumpka Herald, actions taken in the legislature relating to the passage of the bill that became the Act, and the use of a map prepared by the City that detailed the property to be annexed. Rejecting Russell Petroleum's challenge to the Act, the trial court entered an order on October 1, 2003, which stated:
 "This Court finds that the passage of [the Act] was proper and constitutionally valid. This Court thereby denies [Russell Petroleum's] counterclaim. [Russell Petroleum's] property is included on the property annexed by [the Act]. Therefore, [Russell Petroleum] is responsible for payment of appreciable business license fees as well as collection and payment of appreciable taxes. . . .
 "The parties are hereby ordered to work together to have an audit performed to determine the exact amount of business license fees and taxes due to the City of Wetumpka in accordance with this order. This Court reserves jurisdiction to enter further orders to assure compliance with this order."
Following that order, however, the parties were unable to resolve their dispute concerning the amounts allegedly owed by Russell Petroleum. Evidence indicated that the $36,534.68 amount that Russell Petroleum had paid into court related to its collection of sales taxes on retail purchases, not to business-license fees or gasoline taxes as it initially pleaded. By March 2004, Russell Petroleum was contesting *Page 431 
the City's right to collect sales taxes on retail transactions. Notwithstanding that dispute, by that time Russell Petroleum had collected approximately $78,000 in sales taxes after 2002.
In an effort to end the litigation, the City in June 2004 filed a motion for a summary judgment on all remaining issues. In support of that motion, the City presented evidence indicating that Russell Petroleum owed it the following sums for the period from January 1, 2002, through February 29, 2004:
 1. $11,370.75 ($9,096.60 plus $2,274.15 in penalties) in business-license fees for the years 2002, 2003, and 2004;
 2. $62,783.51 ($52,319.59 plus $10,463.92 in penalties) in municipal gasoline taxes; and
 3. $90,274 ($78,249.82 plus $12,024.18 in penalties) in sales taxes.
On August 16, 2004, the trial court granted the City's summary-judgment motion and issued its second order regarding Russell Petroleum's obligations. In entering a final judgment for the City, the trial court found that "[s]ales taxes were placed at issue in this case" and that Russell Petroleum owed the City "the amount of $164,428.26 for license fees, gas taxes, sales taxes, and penalties for the period from January 1, 2002, to February 29, 2004. . . ." The trial court also ordered that the funds Russell Petroleum had paid into court be credited against its $164,428.26 liability and that it pay all gasoline taxes and sales taxes for the months March through July 2004 or be restrained from operating the business. Russell Petroleum timely filed this appeal following the trial court's denial of its postjudgment motion to alter, amend, or vacate the final judgment.
 II. Standard of Review
The ore tenus standard of review applies with respect to the trial court's findings. We have described that standard as follows:
 "`"When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error."' . . .
 "`"The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony, it has an opportunity to evaluate the demeanor and credibility of witnesses." . . . The rule applies to "disputed issues of fact," whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence. . . .
 "`". . . [T]his Court will not disturb the trial court's conclusion unless it is clearly erroneous and against the great weight of the evidence. . . ."'
 ". . . However, `that presumption [of correctness] has no application when the trial court is shown to have improperly applied the law to the facts.' . . ."
Robinson v. Evans, 959 So.2d 634, 637 (Ala. 2006). When the trial court does not make any specific finding of fact on a matter pertinent to its judgment,
 "this Court will assume that the trial judge made those findings necessary to support the judgment. . . . Under the ore tenus rule, the trial court's judgment and all implicit findings necessary to support it carry a presumption of correctness and will not be reversed unless `found to be plainly and palpably wrong.'
 . . . `The trial court's judgment in such a case will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment.'" *Page 432 
Transamerica Commercial Fin. Corp. v. AmSouth Bank,N.A., 608 So.2d 375, 378 (Ala. 1992).
The well-established standard of review for a summary judgment applies to the trial court's August 16, 2004, order granting the City's June 2004 summary-judgment motion. That standard was stated in Prince v. Poole, 935 So.2d 431, 442 (Ala. 2006):
 "`This Court's review of a summary judgment is de novo. We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala.R.Civ.P. In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce "substantial evidence" as to the existence of a genuine issue of material fact. Ala. Code 1975, § 12-21-12. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."'"
(Citations omitted.) Further, when reviewing a summary judgment, this Court resolves all reasonable doubts against the movant.Prowell v. Children's Hosp. of Alabama, 949 So.2d 117,126 (Ala. 2006).
 III. Analysis
Russell Petroleum makes the following two arguments in support of reversing the summary judgment: (1) that the annexation was invalid because, Russell Petroleum argues, the Act was not enacted in compliance with § 11-42-6(b), Ala. Code 1975;[3]
and (2) that the trial court did not have subject-matter jurisdiction to order Russell Petroleum to remit sales taxes.
 A. Compliance with § 11-42-6(b)
Section 11-42-6, Ala. Code 1975, mandates certain procedural requirements when the legislature considers a local bill that proposes to change the territorial boundaries of a municipality. That statute provides:
 "(a) Any bill introduced in the legislature which attempts to annex territory to a municipality . . . shall contain an accurate description of the territory proposed to be annexed to . . . such municipality together with a plat or map of such territory attached. . . . Copies of such map shall also be furnished to the judge of probate for the county . . . where the territory proposed to be annexed to . . . the municipality is located
 "(b) The publication of notice of intention to apply for any local law annexing territory to any municipality . . . shall . . . state that a map showing what territory is to be annexed to . . . such municipality is on file in the office of the judge of probate in the county . . . wherein such territory is located and that such map is open to the inspection of the public."
§ 11-42-6, Ala. Code 1975 (emphasis supplied). The trial court found in its October 1, 2003, order that "the passage of the Act was proper"; "the map [showing the property to be annexed] was filed in the office of the judge of probate on March 1, 2001"; and "the notice was published as required *Page 433 
by the guidelines set out in § 11-42-6(b)." The trial court made those findings after the September 2003 trial in which it heard oral testimony and received evidence concerning, among other subjects, the City's efforts to comply with § 11-42-6(b).
On appeal, Russell Petroleum argues that the map contemplated in § 11-42-6 was not "on file" and therefore not "open to the inspection of the public" within the meaning of subsection (b). The purpose of that map is to provide notice to the public of the property to be annexed. With access to that information, interested persons can learn about a proposed annexation law, determine if they would be affected by a change in municipal boundaries, and fairly protest or otherwise express their views on the proposed legislation. Also, subsection (b) provides that the notice of intention to apply for a local annexation law shall "state that a map showing what territory is to be annexed to . . . such municipality is on file in the office of the judge of probate in the [affected] county."[4] Pursuant to subsection (a), a "cop[y] of such map shall also be furnished to the judge of probate for the county . . . wherein the territory proposed to be annexed to . . . the municipality is located." Because the notice of the proposed local law must be published before the bill is introduced in the legislature, the map mandated by § 11-42-6 necessarily must be furnished to the office of the probate judge in the affected county at or before the beginning of the public-notice period.
The trial court received the following evidence concerning the issue of compliance with the notice requirement and with § 11-42-6. The notice of intention to introduce this local annexation bill was first published in the WetumpkaHerald on March 1, 2001; subsequent notices followed on March 8, 15, and 22. That notice stated that the map indicating the change in the municipal boundary was on file in the office of the Elmore County probate judge. The clerk for the City testified that, on either February 28 or March 1, 2001, she furnished the chief clerk of the Elmore County Probate Court a copy of that legal notice and the map showing the territory to be annexed.
After the city clerk left the map and the notice in the probate judge's office, the chief probate clerk was unsure what to do with them. Initially, she gave the map and the notice to the probate judge and sought his advice on how to maintain them; the probate judge subsequently returned them to her. The chief probate clerk also asked her fellow employees in the probate office whether the map and the notice should be recorded as a formal proceeding or indexed. Deciding against those options, the chief probate clerk on or about May 2, 2001, placed the map and the notice in a file folder and stored that file folder on a corner of her desk. The creation of that folder was the first "recordation" by the probate office that the map had been received in that office. The chief probate clerk, her assistant, and the probate judge knew about the folder containing the notice and the map, but not all members of the probate office staff were aware of the existence of the folder containing the map and the notice. The evidence also indicated that one visitor to the Elmore County probate office requested to see the map and reviewed it. Subsequently, in December 2001 the chief probate clerk indexed *Page 434 
the map in the probate records of the Elmore County probate office.
Drawing all reasonable inferences in support of the trial court's findings of fact, we conclude that there was substantial evidence from which the trial court could have found that the map was furnished to the Elmore County probate office by the city clerk on or before March 1, 2001 — the first date of the public-notice period and over one month before the bill that became the Act was introduced in the legislature.[5]
Accordingly, the trial court did not err when it found that the City satisfied the timeliness component of § 11-42-6 by furnishing the map to the probate office on or before the commencement of the public-notice period for the Act contemplated by § 106, Ala. Const. 1901.
The City argues that, having made this finding, we need not inquire further. According to the City, all that § 11-42-6(b) requires is (1) a statement in the notice of intention to apply for a local law that a map showing the boundary change is available in the office of the probate judge, and (2) that the map be timely furnished to the probate judge. However, Russell Petroleum argues that, even if the requisite statement was made and the City timely furnished the map to the probate office, we must determine whether the map was "on file" and available for inspection in that office within the meaning of § 11-42-6(b). According to Russell Petroleum, an instrument is not "filed" in the probate office until some record of its physical receipt is made and the public can readily access the instrument. Although the chief probate clerk created a file folder on May 2, 2001, into which she placed the map, Russell Petroleum argues that the "filing" of the map did not occur until the chief probate clerk indexed the map in the general register in December 2001. Because the time of that indexing did not precede the public-notice period, Russell Petroleum contends that the annexation legislation was infirm because, it argues, the map was not "open to the inspection of the public."
To comply with the requirements concerning the boundary-change map in § 11-42-6, the proponents of a local act must do more than furnish that map to the probate office and state in the public notice that the map can be inspected there. Merely furnishing the map to the probate court is of no import unless it also is open to inspection. Accordingly, we must examine whether the map in this case actually was available for inspection by the public.
We have not found, nor have we been directed to, any decisions addressing what actions a probate office must undertake before a boundary-change map is open to inspection within the meaning of § 11-42-6(b). Directing us to the "on file" language in subsection (b), Russell Petroleum argues that the map is unavailable unless the probate office records it in the same manner as it records real-property and other instruments. As support for its argument, Russell Petroleum cites two other statutes that address a probate judge's duties concerning the filing of records. First, Russell Petroleum notes that, pursuant to § 12-13-41(3), Ala. Code 1975, a probate judge is obligated "[t]o keep all the books, papers and records belonging to his *Page 435 
office with care and security, the papers arranged, filed and labeled so as to be of easy reference and the books and records lettered and kept with general, direct and reverse indexes. . . ." Second, Russell further argues that § 12-13-43, Ala. Code 1975, is persuasive; in pertinent part, that provision requires probate judges to keep "books . . . in which to make a general direct and a general reverse index of each instrument filed for record in his office. . . ." The City counters that § 12-13-41(15), Ala. Code 1975, specifies those instruments the Elmore County probate judge shall record in the general register having a direct and reverse index, and that annexation maps are not listed in subsection (15) as one of those instruments.
We disagree with Russell Petroleum's argument that the annexation map was not open to inspection during the public-notice period for the Act. Effectively, Russell Petroleum asks that we engraft language onto § 11-42-6(b) that specifies the precise manner in which a probate office must maintain a boundary-change map furnished to it pursuant to that statute. The legislature did not, however, state in § 11-42-6(a) or (b) that a map of the property to be annexed must be indexed, bound, filed, or recorded in any particular form. Further, we reject Russell Petroleum's argument that, because of the inclusion of the words "on file" in subsection (b), we should interpret that provision as requiring a probate judge to record an annexation map in the same manner as real-property records, records of judicial proceedings, or other instruments indexed in the general register. The "on file" language in § 11-42-6(b) connotes that the office of the probate court is the repository for boundary-change maps, not that those maps "belong to" the office of the probate judge and must be indexed in the general register. See § 12-13-41(3), Ala. Code 1975.
Under this interpretation of the "on file" language in § 11-42-6(b), the proponents of a local act can comply with the requirement regarding the boundary-change map in § 11-42-6
if there is substantial evidence that the map was "open to the inspection of the public" in the probate office during the public-notice period. The chief probate clerk testified that, before she indexed the map, at least one person asked to see it; the office staff then located the map, and it was furnished as requested. Moreover, Russell Petroleum did not present any evidence indicating that any of its representatives or other members of the public attempted to see the map but were denied access to it. Based on this evidence, other testimony by the chief clerk of the probate court, and the testimony of the city clerk, the trial court could have found that, during the public-notice period for the Act, the map the City furnished to the Elmore County probate office was open to inspection by the public in that office. Accordingly, the trial court did not err when it held that the City had complied with the notice requirements in § 11-42-6(b).
 B. Jurisdiction to Adjudicate Sales-Tax Liability
After the trial court upheld the Act, it determined that Russell Petroleum owed the City "$164,428.26 for [business] license fees, gas taxes, sales taxes, and penalties. . . ." Russell Petroleum does not contest that, if the annexation is valid, the trial court could have entered a judgment with respect to business-license fees and municipal gasoline taxes. It argues, however, that the judgment should be reversed because, it says, the trial court lacked jurisdiction to order Russell Petroleum to pay municipal sales taxes. *Page 436 
A brief overview of the facts related to the sales-tax award is necessary. In its complaint the City sought to collect only municipal business-license fees and gasoline taxes. Although Russell Petroleum claimed that the collection of those taxes was illegal, it interpleaded $36,534.68 into court; Russell Petroleum alleged in its counterclaim that those moneys constituted "license fees and gasoline taxes." Russell Petroleum further alleged that, because the annexation was invalid and it did not have records indicating the identities of its customers, the trial court should order a cy pres refund of the funds it had paid into court.
As noted above, the trial court received evidence indicating (1) that the funds paid into court were municipal sales
taxes that Russell Petroleum had collected from its retail customers, and (2) that Russell Petroleum had collected over $78,000 in those taxes after 2001. Given these circumstances, the trial court effectively conformed the pleadings to the evidence when it found that "sales taxes were placed in dispute in this case." Moreover, when it entered a judgment for the City, it ordered Russell Petroleum to remit all three types of contested funds — business-license fees, gasoline taxes, and sales taxes.
Unquestionably, the evidence and developments below supported the trial court's finding that Russell Petroleum interjected the sales-tax dispute into consideration. Notwithstanding, we agree with Russell Petroleum that the trial court did not have authority to order it to pay sales taxes.
In 1992 the legislature enacted the Taxpayers' Bill of Rights and Uniform Revenue Procedures Act, Ala. Code 1975, § 40-2A-1
et seq. ("the TBOR"). The legislature intended that the TBOR provide equitable and uniform procedures for the assessment and collection of taxes and for the resolution of tax disputes between taxpayers and the Alabama Department of Revenue ("the Department"). § 40-2A-2(1)a. In disputes concerning unpaid taxes, the TBOR, among other things, established procedures for the entry of a preliminary assessment, a request by the taxpayer for an administrative review of a preliminary assessment, a final assessment, the appeal of a final assessment to the administrative law division of the Department, and an appeal to circuit court of any final order issued by an administrative law judge. See §§ 40-2A-4, -7, and -9. The TBOR is not merely procedural legislation, "but also deals with the rights, remedies, and responsibilities of both taxpayers and the Department." Ex parte State Dep't of Revenue,792 So.2d 380, 383 (Ala. 1999).
Initially, the administrative requirements of the TBOR were directed only to the activities of the Department. However, the legislature subsequently passed the Local Tax Simplification Act of 1998, Act No. 98-192, Ala. Acts 1998 ("the LTSA"). Section 2 of that act states:
 "The Legislature finds and declares that the enactment by this state of a simplified system of local sales, use, rental, and lodgings taxes
which may be levied by or for the benefit of municipalities and counties in Alabama effectuates desirable public policy by promoting understanding of and compliance with applicable local tax laws. . . ."
Section 3 amended, among other sections, § 11-51-201(a), Ala. Code 1975, to read as follows:
 "§ 11-51-201
 "(a) All taxes levied or assessed by any municipality pursuant to the provisions of Section 11-51-200 shall be subject to all definitions, exceptions, exemptions, proceedings, requirements, *Page 437 
provisions, rules and regulations promulgated under the Alabama Administrative Procedure Act, direct pay permit and drive-out certificate procedures, statutes of limitation, penalties, fines, punishments, and deductions for the corresponding state tax as are provided by Sections 40-2A-7, 40-23-1, 40-23-2, 40-23-2.1, 40-23-4 to 40-23-31, inclusive, 40-23-36, 40-23-37, except for those provisions relating to the tax rate, and 40-23-38, except where inapplicable or where otherwise provided in this article."
Upon enactment of the LTSA, both § 11-51-201(a) (concerning municipal sales taxes) and § ll-51-203(a) (addressing municipal excise, use, and lodging taxes) were amended to add language stating that the assessment of those local taxes impacted by the LTSA were "subject to all definitions, exceptions, exemptions, proceedings, requirements, provisions, rules and regulations promulgated under the Alabama Administrative Procedure Act" for the corresponding state tax.
Considering the TBOR (including a 1998 amendment thereto now codified at § 40-2A-13) and the LTSA in their entirety, we held as follows in General Motors Acceptance Corp. v. Cityof Red Bay, 894 So.2d 650 (Ala. 2004):
 "[The LTSA] made the TBOR equally applicable to tax assessments and tax-collection procedures by local taxing authorities such as [municipalities and counties]. . . .
 ". . . .
 ". . . The statutes amended by the LTSA clearly adopt the administrative rules and regulations promulgated by the Department to implement the TBOR, thus making municipalities and counties subject to the statutory mandates applicable to both taxing authorities and taxpayers alike when enforcing the State's tax laws."
894 So.2d at 653-54.
Here the City did not use the administrative procedures mandated by the TBOR when collecting its sales taxes.[6] It did not provide Russell Petroleum notice of a preliminary or final assessment of sales taxes, and there was no administrative consideration of the dispute concerning that alleged deficiency. Instead, the City's initial attempt to collect sales taxes from Russell Petroleum occurred in the Elmore Circuit Court.
We recently were confronted with an analogous situation inCity of Red Bay, supra. There the municipality filed an action in the circuit court to collect sales and/or rental taxes on vehicles leased by the defendant; the administrative procedures envisioned by the TBOR were not invoked before that action was filed. 894 So.2d at 652. Relying on the well-reasoned authority in Patterson v. Gladwin Corp., 835 So.2d 137,153 (Ala. 2002), the Court vacated a class-certification order by the trial court concerning the collection of those municipal taxes and stated:
 "The [Patterson] Court held that compliance with the TBOR is the exclusive means for obtaining a franchise-tax refund, and explicitly stated that `[t]he TBOR is jurisdictional on its face.
See § 40-2A-7(c)(5)c; § 40-2A-9(g)(1).' 835 So.2d at 153. See also State v. Amerada Hess Corp., 788 So.2d 179 (Ala.Civ.App. 2000), in which the Court of Civil Appeals dismissed an action by the Department to recover severance taxes on the basis that the trial court lacked jurisdiction over the action because the Department had failed to follow the TBOR. *Page 438 
 "Because the failure of the City and the County to comply with the provisions of the TBOR before filing their complaint deprived the trial court of jurisdiction, we vacate the class-certification order and remand the cause for the trial court to enter an order of dismissal."
894 So.2d at 656 (quoting Patterson, 835 So.2d at 153).
The City of Red Bay decision is controlling authority. As in that case, the circuit court here did not have subject-matter jurisdiction to adjudicate the sales-tax issue because the City litigated that dispute without availing itself of the administrative procedures in the TBOR, which the LTSA made applicable to the assessment of local sales, use, rental, and lodgings taxes.[7] In so holding, we reject the City's argument that, because Russell Petroleum paid $36,534.68 in sales taxes into court and withheld other such taxes, it waived any objection to the trial court's adjudication of the sales-tax dispute. It is axiomatic that, where a court has no jurisdiction to consider the subject matter of a cause, the litigants may not confer authority on that court to consider that matter by their agreement, stipulation, or other conduct. 21 C.J.S.Courts § 84 (2006).
 IV. Conclusion
The requirements in § 11-42-6(b) regarding the boundary-change map and notice were satisfied as to the Act. Accordingly, the trial court did not err when it found that the annexation of the property on which the business is located was valid. Although Russell Petroleum was subject to the City's taxation ordinances following the annexation of the property into the City, the trial court did not have subject-matter jurisdiction to order Russell Petroleum to remit municipal sales taxes because the City did not comply with the administrative procedures mandated by the TBOR and the LTSA that apply for the assessment of those taxes before the City litigated to collect them. Therefore, we affirm the judgment insofar as it validates the annexation and orders Russell Petroleum to pay the business-license fees and municipal gasoline taxes, but we reverse the judgment insofar as it orders Russell Petroleum to remit sales taxes. We remand this cause to the trial court for further action consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and SEE, LYONS, WOODALL, STUART, SMITH, PARKER, and MURDOCK, JJ., concur.
[1] The Act was introduced in the legislature on April 3, 2001; it became law on May 18, 2001.
[2] The City did not seek unpaid sales taxes in its complaint. Evidence regarding sales taxes was received by the trial court, and the court effectively conformed the pleadings to the evidence and determined that sales taxes were also in dispute. See discussion at Part III.B, "Jurisdiction to Adjudicate Sales-Tax Liability."
[3] Russell Petroleum argued to the trial court that the Act did not comply with § 106, Ala. Const. 1901. However, Russell Petroleum does not contest the constitutionality of the Act before this Court.
[4] In pertinent part, § 106, Ala. Const. 1901, provides that no special, private, or local law on any subject not enumerated in § 104 shall be passed unless legal notice of that bill is published at least once a week for four consecutive weeks in a newspaper in the affected county before the bill is introduced.
[5] Russell Petroleum argues that there was contradictory testimony concerning when the probate office received the map. The chief probate clerk did not recall the exact date of its receipt. The city clerk, however, testified that she delivered the map to the chief probate clerk on or before March 1, 2001 — the first date of publication of legal notice of the Act. Considering the testimony of both these witnesses, the trial court could have found that the map was furnished to the Elmore County Probate Court no later than March 1, 2001.
[6] The City engaged the Alabama Department of Revenue to collect its sales taxes.
[7] Our holding here is limited to municipal sales
taxes. Although the City did not follow the required administrative procedures before it sued to collect the unpaid business-license fees and gasoline taxes, the trial court had jurisdiction to adjudicate the disputes related to the levy of those taxes. Municipal business-license fees and gasoline taxes are not "local sales, use, rental, and lodgings taxes," the levies for which the LTSA mandates uniformity in assessment across the State.